**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>v.<br><br>Maverick Asset Management, LLC, Rodney Scott Phelps and Jason T. Castenir,<br><br>Defendants. | ) | **CIVIL CASE NO.**<br><br>**Complaint for Injunctive and Other Equitable Relief, Restitution and Civil Monetary Penalties under the Commodity Exchange Act** |

Plaintiff, the United States Commodity Futures Trading Commission (the "Commission"), alleges as follows:

## I. SUMMARY

1. From approximately March 1, 2013 through the present (the "Relevant Period"), Defendants Maverick Asset Management, LLC ("MAM"), by and through its employees Rodney Scott Phelps ("Phelps") and Jason T. Castenir ("Castenir"), and Phelps and Castenir directly (collectively, "Defendants") defrauded at least two members of the public ("pool participants") out of approximately $1.2 million in connection with pooled investments in exchange-traded commodity futures contracts.

2. During the Relevant Period, Defendants misappropriated over $800,000 of their pool participants' funds, made material misrepresentations and

omissions to existing and prospective pool participants, provided pool participants with false account statements and operated the pool illegally.

3. By virtue of this conduct, Defendants have engaged, are engaging, and are about to engage in acts and practices in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1), 6m(1) and 6k(2) (2012). Further, MAM violated 17 C.F.R. §§ 4.20(b)-(c) (2014).

4. Throughout the Relevant Period, Phelps and Castenir controlled MAM, directly or indirectly, and did not act in good faith or knowingly induced MAM's violations of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1 *et seq.*, and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* Therefore, Phelps and Castenir are liable for MAM's violations as controlling persons, pursuant to 7 U.S.C. § 13c(b) (2012).

5. The acts and omissions of Phelps and Castenir occurred within the course and scope of their employment, agency and/or office with MAM. Therefore, MAM is liable for these acts and omissions under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014).

6. Accordingly, pursuant to 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices, and to compel their compliance with the Act and Regulations and to further enjoin them from engaging in any commodity-related activity. In addition, the Commission seeks restitution, civil monetary penalties and remedial ancillary relief, including, but not

limited to, disgorgement, trading and registration bans, and such other relief as the Court may deem necessary and appropriate.

7. Unless restrained and enjoined by this Court, Defendants likely will continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II. JURISDICTION AND VENUE

8. 7 U.S.C. § 13a-1 authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

9. This Court has jurisdiction over the conduct and transactions in this case pursuant to 7 U.S.C. § 13a-1.

10. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because certain of Defendants' transactions, acts, practices, and courses of business, which the Commission alleges herein as violations of the Act and Regulations, occurred within this District.

## III. PARTIES

11. **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the

administration and enforcement of the Act and Regulations promulgated thereunder.

12. **Defendant Maverick Asset Management, LLC** is a Kentucky limited liability company that Castenir formed in January 2012 in his capacity as organizer under Kentucky law. During the Relevant Period, MAM did business at 4636 Lebanon Pike, Hermitage, Tennessee. The Commonwealth of Kentucky administratively dissolved MAM as of September 28, 2013. MAM has never registered with the Commission.

13. Based upon information and belief, **Defendant Rodney Scott Phelps** resides in Hermitage, Tennessee. Phelps has never registered with the Commission.

14. **Defendant Jason T. Castenir** resides in Somerset, Kentucky. Castenir has never registered with the Commission.

## IV. FACTS

### A. Summary of Defendants' Scheme

15. During the Relevant Period, Defendants solicited at least two prospective pool participants, one individual and one couple, in order to trade at least $1.2 million in a commodity pool that Phelps and Castenir marketed under MAM's name. Phelps and Castenir caused MAM and a Delaware entity they control, Maverick Investment Holdings, LLC ("MIH"), to transfer some of pool

participants' funds to the commodity pool's trading accounts and misappropriated the remainder, as alleged in more detail below.

16. The pool consisted of two commodity futures trading accounts in the name of MIH, which Defendants controlled throughout the Relevant Period. The pool's commodity trading accounts were carried by Gain Capital Group, LLC, a Futures Commission Merchant ("FCM") registered with the Commission ("Gain Capital").

17. Throughout the Relevant Period, Phelps and Castenir were responsible for all of MAM's operations, including pool participant solicitations, maintenance of MAM's bank accounts, all third party communications regarding the pool's bank and trading accounts and all communications with pool participants, including preparation and distribution of all account statements.

18. During the Relevant Period, MAM, through Phelps and Castenir, solicited pool participants' investments in MAM's commodity trading program. At the direction of Phelps and Castenir, pool participants deposited their funds in bank accounts in the names of MAM and MIH. Thus, during the Relevant Period, MAM functioned as an unregistered Commodity Pool Operator ("CPO") and Phelps and Castenir functioned as unregistered Associated Persons ("APs") of MAM.

19. In approximately July 2013, Defendants opened the pool's first commodity trading account at Gain Capital. In the account opening documents,

Castenir falsely told Gain Capital that: MIH had total liquid assets of $15.5 million and a net worth of $25.5 million; all of the money in the pool's trading account belonged to MIH; the money in the pool's trading account did not belong to any other individual or entity; and MIH did not hold itself out as engaging in the business of investing capital contributions from participants in the commodity futures market.

20. In or about February 2014, Defendants opened another commodity futures trading account at Gain Capital and gave authority to trade that account to a third party. Thereafter, during the Relevant Period, Defendants failed to disclose to pool participants, who relied upon the alleged trading success and expertise of Phelps and Castenir, that they had ceded trading authority of the pool's account to another person.

21. During the Relevant Period, Defendants transferred funds belonging to pool participants to a bank account in the name of MAM, the CPO, rather than to an account in the name of MIH, the commodity pool. In MAM's bank account, Defendants commingled funds belonging to pool participants with funds that were not part of the commodity pool.

22. During the Relevant Period, and as alleged further below, Defendants made false representations and failed to provide material information to pool participants, incurred consistent losses trading pool participants' funds,

misappropriated the remaining pool funds and concealed their trading losses and misappropriations by falsely reporting to pool participants that they earned profits.

## B. Defendants' Fraudulent Solicitations

23. During the Relevant Period, Defendants willfully or recklessly made material misrepresentations and omissions in order to induce prospective pool participants to deposit funds with Defendants to trade futures in the pool, to induce pool participants to maintain their investments and to induce them to deposit additional funds in the pool. During the Relevant Period, pool participants and prospective pool participants relied upon Defendants' material misrepresentations and omissions when they made their decisions to invest with Defendants, to maintain their investments and to invest additional funds.

24. In or about March 2013, Phelps visited one prospective pool participant ("pool participant A") at her home in Mt. Juliet, Tennessee in order to solicit her in person to trade futures through the commodity pool. During that visit, Phelps claimed that: his family trust gave $1 million to MAM; Castenir managed Phelps's family trust interests in MAM; Castenir successfully day-traded commodities on behalf of Phelps's family trust; and Phelps's two adult children received a check every month as a result of Castenir's purportedly successful commodity trading. Upon information and belief, each of these statements is false.

25. During Phelps's visit to pool participant A's home, Phelps called Castenir and put him on speakerphone so that they could solicit pool participant A

together. During that call, Castenir told pool participant A that she would need to deposit approximately $300,000 in the commodity pool in order to receive a monthly profit check of approximately $5,000, in the same purported manner as Phelps's children. During the same call, Castenir told pool participant A that Defendants would trade no more than 2 percent of her funds at any one time, so that pool participant A's risk of loss would be relatively small.

26. On or about March 8, 2013, Phelps emailed to pool participant A two memoranda dated January 2013 and February 2013 and entitled "Maverick Asset Management, STRUCTURED INVESTMENT, Options and Futures Contracts, Opportunities in Equities | Commodities | Currencies" ("the January 2013 and February 2013 Investment Memoranda," respectively). Also on or about March 8, 2013, Phelps emailed a document to pool participant A purporting to show MAM's "Historical Returns" from 2009 to 2012.

27. The February 2013 Investment Memorandum states that Defendants' program was conceived and operated by Phelps, MAM's President. In the January and February 2013 Investment Memoranda, Defendants claimed that MAM would use pool participants' funds to trade futures contracts on commodity exchanges such as the Chicago Mercantile Exchange. Despite the inherent risk in commodity trading, Defendants promised in the January and February 2013 Investment Memoranda to use trading profits to pay interest to pool participants every month, consisting of between 1.0 and 2.25 percent of each pool participants' principal.

Also in the January and February 2013 Investment Memoranda, Defendants promised that MAM would "pay both penalties and increased interest when [interest] payments are late." The foregoing representations that Defendants made to pool participants during the Relevant Period in the January and February 2013 Investment Memoranda were misleading because the interest that Defendants promised to pay pool participants would be generated by commodity trading, which is inherently risky, speculative and uncertain.

28. In the document entitled "Historical Returns," Defendants told pool participant A that through their trading, MAM had earned profits in 46 out of 48 months during the four-year period between 2009 and 2012, including 69.5 percent during May 2010. The "Historical Returns" document also contained "Sample Trades From Past 30 Days," which showed purported actual commodity trades by Defendants on specific days and execution times in January and February 2013. Defendants stated that their purported commodity trades in January and February 2013 earned a cumulative return of over 110 percent. In reality, the trading profits Defendants claimed in their "Historical Returns" document were false.

29. Defendants' claims to pool participants during the Relevant Period that they had been successful commodity futures traders in the past is belied by their lack of experience trading futures. Indeed, beginning in 2010 and continuing throughout the Relevant Period, the only futures trading track record compiled by Defendants was their consistent losses in the pool's trading account at Gain

Capital. Further, Defendants cannot rely upon any successes trading securities. For example, based upon information and belief, in order to prepare the "Historical Returns" document that Defendants sent to pool participant A, Defendants relied upon a securities trading account held by Phelps and carried by E*Trade Securities LLC. However, the profit percentages shown in MAM's "Historical Returns" documents are flatly contradicted by the actual trading in Phelps' E*Trade account.

30. In approximately late spring or early summer 2013, in order to solicit additional funds for the commodity pool, Phelps met on multiple occasions at the home of a couple residing in Memphis, Tennessee, who together became another pool participant ("pool participant B"). On or about June 28, 2013, Castenir emailed pool participant B the February 2013 Investment Memorandum.

31. During one of his solicitation visits with pool participant B, Phelps stated that he owned MAM, which operated a commodity trading program. Shortly thereafter, during a subsequent solicitation visit with pool participant B, Castenir accompanied Phelps. During that visit, Castenir and Phelps claimed that Castenir had earned profits trading "the S&P 500." Castenir and Phelps also stated that Castenir would enter into day trades, and that he and Phelps had never lost much money by trading. Upon information and belief, these statements were false.

32. During their solicitations throughout the Relevant Period, Castenir and Phelps failed to disclose to pool participants A and B that their claims of success trading commodity futures were false, and that there was no basis for their

representations that pool participants A and B might achieve trading profits by investing with Defendants.

### C. Defendants' Failures to Deposit Pool Participant Funds Into the Trading Account, Trading Losses and Misappropriations

#### 1. Defendants' Failure to Deposit Pool Participant Funds Into the Trading Account

33. Between July 9 and July 19, 2013, pool participants A and B sent $350,000 to Defendants to trade in the commodity pool. Rather than deposit all of the pool participants' money in the pool's trading account, Defendants only transferred $50,000. The remaining $300,000 was never transferred to the pool's trading account.

34. On or about September 10, 2013, pool participant A invested an additional $100,000 in the pool, and, on or about October 11, 2013, pool participant B invested an additional $750,000 in the pool. However, Defendants transferred only $300,000 of pool participants' September and October 2013 investments into the pool's trading account. The remaining $550,000 was never transferred to the pool's trading account.

35. In or about March 2014, Defendants deposited an additional $250,000 into the pool's first trading account, approximately $50,000 of which belonged to pool participants A and B and $200,000 of which belonged to other persons and entities. Thus, the commodity pool consisted of approximately $1.4 million, $1.2

million from pool participants A and B commingled with approximately $200,000 from others.

## 2. Defendants' Trading Losses

36. From September 2013 to approximately February 2014, Phelps and Castenir traded the pool's commodity futures trading account, entering into hundreds of trades in primarily the eMini S&P 500 Index commodity futures contract.

37. From September 2013 to approximately February 2014, Defendants lost approximately $303,000 through unprofitable trades and commission charges. Therefore, within approximately six months, Defendants lost over 85 percent of the funds pool participants A and B deposited in the commodity pool (approximately $303,000 in losses on $350,000 invested).

38. In or about February 2014, Defendants opened another commodity trading account in the name of the pool at Gain Capital and gave authority to trade this account to a third party. However, throughout the Relevant Period, Defendants failed to disclose to pool participants that they relinquished trading authority over the pool's account to the third party. From approximately March 1, 2014 to approximately July 31, 2014, Defendants lost more than $47,000 in the pool's trading accounts through unprofitable trades and commission charges.

39. Overall, from September 2013 to July 2014, Defendants' trading resulted in net monthly losses in ten consecutive months and they failed to trade in

July 2014. During the Relevant Period, excluding these eleven months, Defendants did not use pool funds to trade futures in an account carried by an FCM registered with the Commission.

40. Of the $600,000 Defendants deposited into the pool's trading accounts, they lost approximately $350,000 through unprofitable trades and commission charges. Of the remaining $250,000, Defendants withdrew approximately $248,000 from the pool's accounts at Gain Capital.

3. **Defendants' Misappropriations**

41. Of the $1.2 million Defendants received from pool participants, they misappropriated more than $800,000. This includes funds that were never deposited in the pool's trading accounts as well as money that Defendants withdrew from the pool's trading accounts and never returned to pool participants. Defendants moved these funds between bank accounts held by MAM and MIH, and made numerous cash withdrawals to pay for a variety of things.

42. For example, during the one-week period beginning July 19, 2013, the day pool participant A's $100,000 investment was deposited into MAM's bank account, Phelps and Castenir misappropriated over $33,000 for their personal use by writing checks to themselves, withdrawing cash and making check card purchases. In other instances, Phelps and Castenir spent funds belonging to pool participants A and B on, among other things, checks payable to cash, rental

payments for their office in Nashville, and travel expenses, including at least one trip to Belize.

### D. **Defendants' False Account Statements**

43. During the Relevant Period, Defendants sent out false trading account statements to pool participants A and B. Further, Defendants sent pool participant A an e-mail misrepresenting the value of the pool.

44. Defendants' false trading account statements indicated that pool participants A and B were earning profits as a result of Defendants' commodity futures trading. In reality, Defendants were losing money trading commodity futures in each of the months covered by their false account statements.

45. In or about October, November and December 2013, and in or about January and February 2014, Defendants used information they received from Gain Capital to fabricate trading account statements they sent to pool participants A and B. For example, Defendants emailed pool participants A and B trading account statements that omitted profit and loss summaries, thereby concealing from them the net losses sustained through Defendants' trading. These trading account statements also contained a fake account number.

46. In addition, on or about November 20, 2013, Castenir sent pool participant A an email that falsely claimed that the pool participant earned "$5889.50."

47. During the Relevant Period, Defendants' false account statements and email lulled pool participants A and B into believing that their funds were secure and that Defendants' trading on their behalf was profitable. Relying upon the false account statements they received from Defendants during the Relevant Period, pool participants A and B maintained their funds in the commodity pool and invested additional funds. For example, pool participant B made an additional investment of $750,000 in Defendants' commodity pool after receiving false account statements from Defendants on or about October 8, 2013.

48. Each account statement purporting to show commodity futures trading that Defendants sent to pool participants during the Relevant Period was false.

49. Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

**E. <u>Phelps and Castenir are Liable as Control Persons of MAM</u>**

50. During the Relevant Period, Phelps was a member of MAM and its President, Chief Executive Officer and Chief Operating Officer. Phelps told pool participants, both orally and in writing, that he devised MAM's commodity trading strategy and he explained the strategy to pool participants A and B. Phelps also told pool participant B that Castenir worked for him.

51. During the Relevant Period, Castenir was a member of MAM and he gave pool participants and MAM's bank a business card stating that he was a "Lead Consultant" of MAM. Castenir explained MAM's commodity trading

strategy to pool participants, both orally and in writing. In addition, Castenir responded to pool participant A's question about how much she should invest in the pool, and pool participant A relied upon Castenir's response. Additionally, in the account opening documents for the pool's first commodity futures trading account at Gain Capital, Castiner stated that he was the President or Managing Member of MIH, Defendants' commodity pool.

52. During the Relevant Period, Phelps and Castenir entered into agreements on behalf of MAM, including agreements to open accounts. Phelps and Castenir jointly opened and controlled all of the commodity pool's bank and trading accounts, including all accounts in the names of MAM and MIH. Further, during the Relevant Period, Phelps and Castenir discussed material issues concerning the commodity pool with employees of Gain Capital and the third party who traded the pool's account.

53. Throughout the Relevant Period, Phelps and Castenir did not act in good faith or knowingly induced, directly or indirectly, MAM's violations of the Act alleged in this complaint, including MAM's misappropriations, fraudulent representations, false account statements, failure to register as a CPO, allowing Phelps and Castenir to act as unregistered APs, failure to receive pool participants' funds in the name of the pool and commingling of pool participants' funds.

F. MAM is Liable for the Violations of its Agents, Phelps and Castenir

54. Throughout the Relevant Period, and as alleged above, Phelps and Castenir acted as agents of MAM. Therefore, MAM is responsible for Phelps and Castenir's violations of the Act.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE
### FRAUD IN CONNECTION WITH COMMODITY FUTURES TRADING
### Violations of 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012) by All Defendants

55. Paragraphs 1 through 55 are realleged and incorporated herein by reference.

56. 7 U.S.C. §§ 6b(a)(1)(A)-(C) makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market --

> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of

> any order or contract, or in regard to any act of agency performed, with respect to any order or contract for . . . the other person . . . .

57. During the Relevant Period, and continuing through the present, Defendants violated 7 U.S.C. §§ 6b(a)(1)(A)-(C) in or in connection with orders to make or the making of commodity futures contracts for or on behalf of other persons, by, among other things: (i) misappropriating pool participants' funds; (ii) making material, fraudulent oral and written representations and omissions to prospective and existing pool participants about Defendants' trading history, their failures to trade pool participants' funds as represented and their purported trading successes; (iii) issuing false account statements to pool participants; and (iv) failing to disclose to pool participants that they transferred the authority to trade the pool's account to another person.

58. Defendants engaged in the acts and practices described in this count willfully, knowingly, or with reckless disregard for the truth.

59. Each act of misappropriation, misrepresentation or omission of material fact, and issuance of a false account statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C).

60. Throughout the Relevant Period, Phelps and Castenir directly or indirectly controlled MAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. §§ 6b(a)(1)(A)-

(C) by MAM. Therefore, pursuant to 7 U.S.C. § 13c(b), Phelps and Castenir are liable for each violation of 7 U.S.C. § 6b(a)(1)(A)-(C) by MAM as controlling persons of MAM.

61. Throughout the Relevant Period, the acts and omissions of Phelps and Castenir described in this Complaint were done as agents of MAM. Therefore, pursuant to 7 U.S.C § 2(a)(1)(B) and 17 C.F.R. § 1.2, MAM is liable as a principal for each act, omission, or failure of Phelps and Castenir constituting violations of 7 U.S.C. §§ 6b(a)(1)(A)-(C).

**COUNT TWO**
**FRAUD BY A COMMODITY POOL OPERATOR AND AN ASSOCIATED PERSON OF A COMMODITY POOL OPERATOR**
**Violations of 7 U.S.C. § 6o(1) (2012) by All Defendants**

62. Paragraphs 1 through 55 are realleged and incorporated herein by reference.

63. 7 U.S.C. § 1a(11) (2012), defines a "Commodity Pool Operator," in relevant part, as a person

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in commodity interests, including any – commodity for future delivery . . . .

64. 17 C.F.R § 1.3(aa) (2014), defines an AP as any "natural person who is associated . . . with . . . [a] commodity pool operator as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or

performing similar functions), in any capacity which involves . . . the solicitation of funds, securities, or property for a participation in a commodity pool."

65. 7 U.S.C. § 6o(1), makes it unlawful

> for a . . . commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly –
>
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

66. As set forth above, during the Relevant Period, MAM acted and continues to act as a CPO by soliciting, accepting, or receiving funds from others while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in commodity futures contracts.

67. As set forth above, during the Relevant Period, Phelps and Castenir acted and continue to act as APs of MAM, a CPO, by virtue of their employment with MAM in capacities that involved the solicitation of funds, securities, or property for participation in a commodity pool.

68. During the Relevant Period, and continuing through the present, through the use of the mails or other means or instrumentalities of interstate

commerce, MAM, as a CPO, and Phelps and Castenir, as APs of MAM, violated 7 U.S.C. § 6o(1) by: (i) misappropriating pool participants' funds; (ii) making material, fraudulent oral and written representations and omissions to prospective and existing pool participants about Defendants' trading history, their failures to trade pool participants' funds as represented and their purported trading successes; and (iii) issuing false account statements to pool participants; and (iv) failing to disclose to pool participants that they transferred the authority to trade the pool's account to another person.

69. Defendants engaged in the acts and practices described in this count willfully, knowingly or with reckless disregard for the truth.

70. Each act of misappropriation, misrepresentation or omission of material fact, and issuance of a false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6o(1).

71. Throughout the Relevant Period, Phelps and Castenir directly or indirectly controlled MAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting MAM's violations of 7 U.S.C. § 6(o)(1). Therefore, pursuant to 7 U.S.C. § 13c(b), Phelps and Castenir are liable for each of MAM's violations of 7 U.S.C. § 6(o)(1) as controlling persons of MAM.

72. Throughout the Relevant Period, the acts and omissions of Phelps and Castenir described in this Complaint were done as agents of MAM. Therefore,

pursuant to 7 U.S.C § 2(a)(1)(B) and 17 C.F.R. § 1.2, MAM is liable as a principal for each act, omission, or failure of Phelps and Castenir constituting violations of 7 U.S.C. § 6o(1).

**COUNT THREE**
**FAILURE TO REGISTER AS A COMMODITY POOL OPERATOR AND AS ASSOCIATED PERSONS**
**Violations of 7 U.S.C. § 6m(1) (2012) by MAM and Violations of 7 U.S.C. § 6k(2) (2012) by All Defendants**

70. Paragraphs 1 through 55 are realleged and incorporated herein by reference.

71. 7 U.S.C. § 6m(1) provides that it is unlawful for any CPO, unless registered with the Commission, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

72. As set forth above, during the Relevant Period, MAM used the mails or instrumentalities of interstate commerce in connection with its business as a CPO without registering with the Commission, in violation of 7 U.S.C. § 6m(1).

73. 7 U.S.C. § 6k(2) requires those who solicit funds on behalf of a commodity pool to register with the Commission as APs of the CPO. 7 U.S.C. § 6k(2) also states that it is unlawful for a CPO to permit such persons to become or remain associated with the CPO in such capacity if the CPO knew or should have known that the persons were not registered with the Commission as APs of the CPO.

74. As set forth above, without registering with the Commission, Phelps and Castenir acted and continue to act as APs of MAM, a CPO. Further, MAM permitted Phelps and Castenir to become and remain associated with MAM in capacities that involved soliciting pool participants' funds because MAM's managing agents, Phelps and Castenir, knew they were not registered with the Commission as APs of MAM. Thus, Defendants violated 7 U.S.C. § 6k(2).

75. During the Relevant Period, each use of the mails or any means or instrumentality of interstate commerce by MAM while acting as a CPO without registration, each day that Phelps and Castenir acted as APs of MAM without registration and each day that MAM allowed Phelps and Castenir to become and remain associated with MAM knowing that they were not registered, including but not limited to those uses and days specifically alleged herein, are alleged as separate and distinct violations of 7 U.S.C. §§ 6m(1) and 6k(2).

76. Throughout the Relevant Period, Phelps and Castenir directly or indirectly controlled MAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting MAM's violations of 7 U.S.C. §§ 6m(1) and 6k(2). Therefore, pursuant to 7 U.S.C. § 13c(b), Phelps and Castenir are liable for each of MAM's violations of 7 U.S.C. §§ 6m(1) and 6k(2) as controlling persons of MAM.

77. Throughout the Relevant Period, the acts and omissions of Phelps and Castenir described in this Complaint were done as agents of MAM. Therefore,

pursuant to 7 U.S.C § 2(a)(1)(B) and 17 C.F.R. § 1.2, MAM is liable as a principal for each act, omission, or failure of Phelps and Castenir constituting violations of 7 U.S.C. § 6k(2).

## COUNT FOUR
## PROHIBITED ACTIVITIES OF A COMMODITY POOL OPERATOR
## Violations of 17 C.F.R. §§ 4.20(b)-(c) (2014) by Defendant MAM

78. Paragraphs 1 through 55 are realleged and incorporated herein by reference.

79. 17 C.F.R. § 4.20(b) provides that all funds received by a CPO from pool participants must be received in the name of the pool. 17 C.F.R. § 4.20(c) provides that commodity pool funds may not be commingled with the funds of any other person.

80. During the Relevant Period, MAM violated 17 C.F.R. § 4.20(b) by receiving funds from pool participants for investment in the pool in the name of MAM, rather than in the name of MIH, the pool.

81. During the Relevant Period, MAM violated 17 C.F.R. § 4.20(c) by commingling pool participants' funds with the funds of other persons in bank and trading accounts in the name of MAM and MIH.

82. Each instance of MAM receiving funds other than in the name of the commodity pool, and each instance of MAM commingling pool participants' funds with the funds of other persons, including but not limited to those specifically

alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. §§ 4.20(b) and (c), respectively.

83. Throughout the Relevant Period, Phelps and Castenir directly or indirectly controlled MAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting MAM's violations of 17 C.F.R. §§ 4.20(b)-(c). Therefore, pursuant to 7 U.S.C. § 13c(b), Phelps and Castenir are liable for each of MAM's violations of 17 C.F.R. §§ 4.20(b)-(c) as controlling persons of MAM.

## VI. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to the Court's equitable powers, enter:

A. An order finding that: Defendants violated 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1), 6m(1) and 6k(2); MAM violated 17 C.F.R. §§ 4.20(b) and (c); Phelps and Castenir are liable for MAM's violations as controlling persons of MAM, pursuant to 7 U.S.C. § 13c(b); and MAM is liable for Phelps and Castenir's violations as their principal, pursuant to 7 U.S.C. § 2(a)(1)(b) and 17 C.F.R. § 1.2;

B. An order of permanent injunction prohibiting Defendants, and any other persons or entities associated with them, from engaging in conduct in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6o(1), 6m(1) and 6k(2) and 17 C.F.R. §§ 4.20(b) and (c);

C. An order of permanent injunction prohibiting Defendants, and any other persons or entities associated with them, from directly or indirectly:

1. Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012));

2. Entering into any transactions involving a "commodity interest" (as that term is defined in 17 C.F.R. § 1.3(yy) (2014)) for their own personal account or for any account in which they have a direct or indirect interest;

3. Having any commodity interest traded on their behalf;

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving a commodity interest;

5. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling a commodity interest;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2014); and/or

7. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2014)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1(a)(38) (2012)) registered, exempted from registration or

required to be registered with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9).

D. An order directing Defendants, and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts and practices which constitute violations of the Act or the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E. An order directing Defendants, and any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to pool participants whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constitute violations of the Act or Regulations, as described herein, and pre- and post-judgment interest from the date of such violations;

F. An order directing Defendants, and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the pool participants or investors whose funds Defendants received as a result of the acts and practices which constituted violations of the Act or Regulations, as described herein;

G. An order directing Defendants, and any successors thereof, to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of

not more than the higher of: (1) triple the monetary gain to each Defendant for each violation of the Act or Regulations; or (2) $140,000 for each violation committed by a Defendant, plus post-judgment interest;

H. An order directing Defendants, and any successor thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I. Such other and further relief as the Court deems proper.

Dated: August 19, 2015

Respectfully submitted,

PLAINTIFF U.S. COMMODITY FUTURES TRADING COMMISSION

Glenn I. Chernigoff, Trial Attorney
DC Bar No. 488500
gchernigoff@cftc.gov

Alison B. Wilson, Chief Trial Attorney
DC Bar No. 475992
awilson@cftc.gov

U.S. Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5035 (Chernigoff)
(202) 418-5523 (fax)

Counsel for Plaintiff